**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

AMERICAN ZURICH INSURANCE
COMPANY,

    Plaintiff,

       v.

CHECKER CAB OF AUGUSTA, INC.,

    Defendant.

CV 112-054

---

**O R D E R**

---

Presently pending before the Court are Defendant's Motion for Summary Judgment (doc. no. 20) and Plaintiff's Motion for Summary Judgment (doc. no. 25). For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED** and Plaintiff's Motion for Summary Judgment is **DENIED**.

## I. BACKGROUND

This case involves a claim by Plaintiff American Zurich Insurance Company ("Zurich") for unpaid workers' compensation premiums allegedly owed by Defendant Checker Cab of Augusta, Inc. ("Checker Cab"). The material facts are not in dispute, yet the parties disagree on whether Checker Cab's taxi drivers are classified as employees or independent contractors. The parties agree that the outcome of that determination is

dispositive of the claims for unpaid premiums. If the taxi drivers are deemed to be employees, Checker Cab owes Zurich the premiums alleged. On the other hand, if the taxi drivers are deemed to be independent contractors, Checker Cab is entitled to summary judgment.

## A. Factual Background

### 1. *The Insurance Policies*

In June 2007, Checker Cab began operating as a taxicab company in and around Augusta, Georgia. (Doc. no. 22 ¶ 1.) Checker Cab applied for workers' compensation coverage through the Georgia Workers' Compensation Assigned Risk Plan which was administered by the National Council on Compensation Insurance ("NCCI"). (Doc. no. 25, Ex. 1 ¶¶ 4, 6.) The NCCI then assigned Zurich to issue the workers' compensation insurance sought by Checker Cab. (Id. ¶ 8.) Zurich issued four separate workers' compensation insurance policies to Checker Cab for the following periods: from December 2, 2008, through December 2, 2009, (the "First Insurance Policy"); from December 2, 2009, through December 2, 2010, (the "Second Insurance Policy"); from December 2, 2010, through December 2, 2011, (the "Third Insurance Policy"); and from December 2, 2011, through December 2, 2012, (the "Fourth Insurance Policy"). (Id. ¶ 1.) The Fourth Insurance Policy was cancelled by Zurich on April 24, 2012. (Id. ¶ 2.)

The Insurance Policies provide that the premiums will be determined by Zurich's manual of rules, rating plans, and classifications and that the premiums are subject to change by audit to be made annually. (Id. ¶¶ 12, 14.) Each of the Insurance Policies included an estimated premium that was calculated by taking the estimated remuneration for persons covered by the Insurance Policies and multiplying that figure by a set rate, which was based on the classification of the covered person. (Id. ¶ 16.) Each of the Insurance Policies included classifications for two types of covered persons: clerical office employees and all other taxicab company employees, including drivers. (Id. ¶ 17.) The set rate for clerical office employees was much lower than the set rate for other employees and drivers, which reflects the higher risk involved in covering drivers. (See id. ¶¶ 18-21.)

Based primarily on the estimated annual premiums, Checker Cab paid $7,342 towards the First Insurance Policy, $7,906 towards the Second Insurance Policy, $9,738 towards the Third Insurance Policy, and $7,143 towards the Fourth Insurance Policy. (Id. ¶¶ 16, 22; see also Compl. ¶¶ 30, 47, 64, 81, 88.) Subsequent to the end date of the First Insurance Policy, Zurich performed an audit and revised the estimated premium upwards to reflect the coverage of some taxi drivers as employees (those who leased cabs from Checker Cab). (Compl. ¶¶ 36, 38; King Dep. at 20.) Zurich determined that the actual premium due was

3

$64,798. (Compl. ¶ 39.) Checker Cab refused to pay the additional premium and filed an appeal with the NCCI. (Doc. no. 25, Ex. 1 ¶ 26.)

The Second, Third, and Fourth Insurance Policies were issued during the pendency of the NCCI Appeal. (Id.) After a second audit, Zurich determined that the final premium for the Second Insurance Policy was $263,770. (Compl. ¶ 55.) The premium increased dramatically because Zurich determined that *all* of the taxi drivers who had contracts with Checker Cab were employees (including drivers who owned their own cabs). (King Dep. at 20.) After a third audit, Zurich determined that the final premium for the Third Insurance Policy was $515,965. (Compl. ¶ 73.) As to the Fourth Insurance Policy, Zurich estimated the annual premium to be $416,447, but subsequently revised the estimate up to $451,953.[1] (Id. ¶ 81.)

As claimed by Zurich, the balances due on the First, Second, Third, and Fourth Insurance Policies are $57,456; $255,864; $210,824; $68,422, respectively, for a total of $592,566.[2] (Leyland Aff. ¶¶ 4-9.) Apparently, Checker Cab does not dispute Zurich's calculations. (Doc. no. 21 at 2-3; Doc.

---

[1] Checker Cab only paid a small portion of the estimated annual premium of the Fourth Policy and disputed the unpaid balance. (Compl. ¶ 88.) As previously noted, the Fourth Insurance Policy was cancelled after only a few months. (Leyland Aff. ¶ 7.)

[2] The Complaint seeks over $1.2 million for unpaid workers' compensation premiums. (See Compl. ¶ 92.) However, in Zurich's summary judgment filings, it seeks only $592,566. (Leyland Aff. ¶ 9; see also Doc. no. 25, Ex. 2 at 24.) The Court will defer to the smaller figure because it is supported by an affidavit and documentary evidence.

no. 36 at 1.) Checker Cab also admits that if its taxi drivers are determined to be employees, then Checker Cab would be responsible for paying the workers' compensation premium balances for the taxi drivers.[3] (Doc. no. 25, Ex. 1 ¶ 28; Doc. no. 37 ¶ 28.) Accordingly, the most pertinent facts in this case pertain to the relationship between Checker Cab and its taxi drivers.

### 2. *Relationship Between Checker Cab and Taxi Drivers*

During the time periods in which the Insurance Policies were in force, all of Checker Cab's taxi drivers executed one of two form agreements. (Rozanas Dep. at 45-48.) Those drivers that owned their own taxicabs ("Owner-Drivers") signed the "Independent Contractor Franchise Agreement for Owner/Operator." (Id. at 47-48, & Ex. 10.) Those drivers that operated a taxicab that they leased from Checker Cab ("Lessee-Drivers") executed the "Independent Contractor Franchise Agreement."[4] (Id. at 45-47, & Ex. 9.) Both contracts have renewable week-to-week terms and are, for the most part, quite similar. (See id. at 46-47, & Exs. 9-10.)

---

[3] There are some individuals who drive medical vans, shuttle vans, and limos for Checker Cab. Checker Cab agrees that they are properly classified as employees, and those premiums are not disputed in this case. (Rozanas Dep. at 54.)

[4] In 2009, Checker Cab had 53 Owner-Drivers and 27 Lessee-Drivers. In 2010, Checker Cab had 58 Owner-Drivers and 17 Lessee-Drivers. In 2011, Checker Cab had 61 Owner-Drivers and 14 Lessee-Drivers. Prior to June of 2012, Checker Cab had 57 Owner-Drivers and 8 Lessee-Drivers. After June of 2012, Checker Cab sold the few remaining cabs that it owned, and all 65 drivers were Owner-Drivers. (Rozanas Aff. ¶ 3).

Both contracts unambiguously designate the taxi drivers as independent contractors. Owner-Drivers and Checker Cab agreed that Owner-Drivers were "independent contractor[s] free from interference or control on the part of Checker Cab in operation of the Cab, subject only to adherence to applicable statutes and ordinances." (Id., Ex. 10 § I.a.) Similarly, Lessee-Drivers agreed with Checker Cab that they were "independent contractor[s] free from interference or control on the part of [Checker Cab] in operation of said taxicab, subject only to adherence to applicable statutes and ordinances of the State, County, and City" where the Lessee-Driver operates his or her taxi. (Id., Ex. 9 § I.a.)

Both Owner-Drivers and Lessee-Drivers agreed with Checker Cab that they were "free from authority and control" of Checker Cab, were not included or covered by Checker Cab's workers' compensation insurance plans, and expressly waived such coverage as a condition of their independent contractor status. (Id., Exs. 9 § I.b., 10 § I.b.) No taxi driver has ever filed a workers' compensation claim against Checker Cab, even though at least one of its drivers has been injured while operating his taxi since 2008. (Rozanas Aff. ¶ 7.)

Checker Cab agreed to provide all its drivers with a dispatch service. (Rozanas Dep., Exs. 9 § III.a., 10 § II.a.) Through the contracts, Checker Cab vested discretion in operation of the cabs to the individual drivers and agreed that

Checker Cab "shall do no more than make available" the dispatch service of prospective passengers. (Id., Exs. 9 § IX.c., 10 § VI.c.) Both Owner-Drivers and Lessee-Drivers pay Checker Cab a flat fee per week (which increased from $275 to $325 during the policy periods) in exchange for the dispatch service. (Id. at 62, & Exs. 9 § VIII., 10 § IV.c.) Lessee-Drivers pay an additional fee of about $175 per week to lease the taxicabs and for other expenses covered by Checker Cab. (Rozanas Aff. ¶¶ 3-4.) These fees are constant regardless of the number of hours worked, the number of passengers driven, or the total amount of fares collected by the taxi driver. Drivers may choose to pay additional fees to Checker Cab to gain access to passengers at Fort Gordon, the Augusta Regional Airport, or the Augusta Mall. (Doc. no. 22 ¶ 5.) After receiving those access fees, Checker Cab then transmits the access fees to the entities that control access at Fort Gordon, the Augusta Regional Airport, and the Augusta Mall – without any mark-up for Checker Cab. (Id.)

Both Owner-Drivers and Lessee-Drivers keep the fares they receive from passengers. (Rozanas Aff. ¶ 2.) Although Checker Cab processes some credit card and other payments, it does not ultimately receive the fares – all the fares ultimately belong to the drivers. (Id.; see also Doc. no. 39 at 3.) The fare rates are set by Augusta-Richmond County, not Checker Cab. (Rozanas Aff. ¶ 2.) Checker Cab pays no salaries, wages,

bonuses, vacation pay, sick pay, or any other form of remuneration to its taxi drivers. (Id.)

Under the contracts and in practice, Checker Cab has no control over when its drivers work or how often they work. (See Rozanas Dep. at 29, & Exs. 9, 10.) Checker Cab does not set its drivers schedules or impose minimum or maximum hour requirements. (Id.) For the taxicabs owned by Checker Cab, two Lessee-Drivers typically share each vehicle, but they coordinate their own schedules and set their own shifts. (Id. at 87-88.) Further, Checker Cab does not impose any parameters on where its drivers must work.[5] (See id. at 29-30, & Exs. 9, 10.) Owner-Drivers and Lessee-Drivers drivers are not required to answer any call from Checker Cab's dispatcher and can decline to transport any passenger even after answering a call from the dispatcher. (Rozanas Aff. ¶ 5.)

Both Owner-Drivers and Lessee-Drivers are required to pay for all fuel needed to operate their taxicabs. (Rozanas Dep., Exs. 9 § III, 10 § III.) Owner-Drivers are also required to furnish oil, anti-freeze, tires, and all maintenance services for their cabs. (Id., Ex. 10 § III.) Checker Cab furnishes oil, anti-freeze, tires, and maintenance for the Lessee-Drivers' vehicles. (Id., Ex. 9 § III.) Owner-Drivers pay for their own liability insurance, registration fees, and vehicle taxes.

---

[5] As previously noted, Checker Cab's drivers are *free to choose* to pay the additional access fees imposed by Fort Gordon, the Augusta Regional Airport, and the Augusta Mall.

(Doc. no. 22 ¶ 6.) Those expenses are covered by Checker Cab for Lessee-Drivers.[6] (Id.) Both Owner-Drivers and Lessee-Drivers obtain their own "hack permit" issued by the Richmond County Sheriff's Office and their own business license issued by the Augusta-Richmond County License and Inspection Department. (Id.) All the taxi drivers agreed to report and pay their state and federal income taxes without any involvement of Checker Cab. (Rozanas Dep., Exs. 9 § I.c., 10 § I.c.)

The contracts do contain a "Nuisance Clause," which prohibits certain types of behavior, such as gambling, smoking, carrying firearms, spitting, profane language, and any other behavior "deemed harmful to the company." (Id., Exs. 9 § V., 10 § V.) Checker Cab was given the power to fine the taxi drivers for nuisance violations and to terminate the contract if the driver accumulated five complaints over a twelve-month period. (Id.) Checker Cab also requires the taxi drivers to wear collared shirts with a Checker Cab logo and to keep their cabs clean. (Rozanas Aff. ¶ 6.) According to Checker Cab, it imposes these requirements so that the taxi drivers and Checker Cab comply with the Augusta-Richmond County Ordinance relating to taxicabs. (Id.) Checker Cab also has a taxi driver "Code of

---

[6] Though Checker Cab provided liability insurance for Lessee-Drivers, the Lessee-Drivers did agree to pay a $500 deductible for damages caused by accidents, fires, and thefts. (Rozanas Dep., Ex. 9 § IV.) Both contracts also included indemnification clauses, in which the drivers agreed to assume full responsibility for any damages caused by use of the cab and indemnify Checker Cab from any claims arising from use of the cab. (Id., Exs. 9 § XIV., 10 § XIII.)

Ethics," which it posts on its website and hands out to applicant-drivers. (Rozanas Dep. at 56-57, & Ex. 13.) According to Checker Cab's Code of Ethics, its taxi drivers pledged to adhere to a lengthy list of rules.[7]

The Owner-Drivers and Lessee-Drivers' contracts also include a non-compete clause. (Rozanas Dep., Exs. 9 § XVI., 10 § XV.) The non-compete clause prohibits the taxi drivers from establishing an employment or other designated relationships with any business in competition with or similar to Checker Cab's business. (Id.) This restriction applies during the course of the week-to-week contract with Checker Cab and for a period of twelve months following expiration or termination of the contractual relationship. The non-compete restriction purports to apply to the following geographic territories: (i) all counties in Georgia and South Carolina, (ii) all other states in the United States, and (iii) all other countries of the world; provided that, with respect to clauses (ii) and (iii), that Checker Cab derives 5% of its gross revenues from such geographic area prior to the date of expiration or

---

[7] For example, the taxi drivers pledged to be aware of certain laws, treat all passengers with courtesy and respect, accept all lawful requests for transport, take the shortest or most practical route, offer to turn on the air-conditioning or heat, accept all forms of payment, wear the approved uniform and ID badge, report any incident or accident to Checker Cab immediately, assist other drivers with disabled vehicles, and so on. (See id., Ex. 13.)

termination of the contract.[8]  (Id.)  Further, there is a non-solicitation clause in each agreement prohibiting the taxi drivers from hiring or recruiting Checker Cab employees for a period of twelve months following expiration or termination of the contract.  (Id., Ex. 9 § XV., 10 § XVI.)

### B. Procedural History

Prior to the filing of this action, the NCCI appeal was dismissed.  (Doc. no. 25, Ex. 1 ¶ 26.)  Checker Cab represents that it was not dismissed on the merits.[9]  (Doc. no. 37 ¶ 26.)  On April 11, 2012, Zurich filed the Complaint asserting breach of contract claims for the unpaid premiums on each of the Insurance Policies.  (See Doc. no. 1.)  On February 28, 2013, both Zurich and Checker Cab filed motions for summary judgment.  (Doc. nos. 20, 25.)

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Facts are "material" if they could affect the outcome of the suit under the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must

---

[8] Though two drivers left Checker Cab and began working for another cab company in 2008 or 2009, Checker Cab has never attempted to enforce the non-compete clause. (Rozanas Dep. at 144-46; Rozanas "March 21, 2013" Aff. ¶ 2.)

[9] The basis of the dismissal is unclear, as the Court has not located the NCCI dismissal in the record.

view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." U.S. v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot

meet the burden at trial is insufficient.  Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment."  Id.  When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden.  If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated."  Fitzpatrick, 2 F.3d at 1116.  If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency."  Id. at 1117.  The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of the Court gave the parties notice of the motions for summary judgment and informed them of

the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. nos. 32-33.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is now ripe for consideration.

## III. DISCUSSION

Under Georgia law, Checker Cab is required to provide workers' compensation insurance for its employees, but not for independent contractors. See O.C.G.A. §§ 34-9-1, 34-9-2, 34-9-120. Therefore, the parties agree that Checker Cab is liable for the unpaid premiums if the Owner-Drivers and Lessee-Drivers are deemed "employees" under Georgia law. The Parties also generally agree on the applicable legal framework. First, the Court will determine whether Checker Cab is estopped from denying an employer-employee relationship under the "Local Ordinance Rule." Second, the Court will determine whether the taxi drivers qualify as independent contractors pursuant to O.C.G.A. § 34-9-2(e).

### A.   Local Ordinance Rule

In numerous cases, the Georgia Court of Appeals has "held that, for the purposes of determining employer liability under the Georgia Workers' Compensation Act, O.C.G.A. § 34-9-1 et

seq., a taxicab company is estopped to deny that an affiliated driver is an employee (and claim that he is an independent contractor) when local ordinances either directly or indirectly prohibit the use of independent contractors, or the independent contractor himself is not fully and properly licensed and operating in compliance with the local ordinances." Rapid Group, Inc. v. Yellow Cab of Columbus, Inc., 253 Ga. App. 43, 44, 557 (2001); see also Yellow Cab of Chatham Cnty., Inc. v. Karwoski, 226 Ga. App. 63 (1997); Worrell v. Yellow Cab Co., 146 Ga. App. 748 (1978). This is referred to as the "local ordinance rule." Rapid Group, 253 Ga. App. at 44.

Accordingly, the Court references the Augusta-Richmond County Code section under which Checker Cab and the taxi drivers are licensed and operating:

> A driver may be an employee of a licensee *or an independent contractor* who leases his taxicab from a licensee. The driver and licensee may determine by contract the terms of their relationship. Nothing in this article should be interpreted to the contrary.

Augusta-Richmond Cnty. Code § 6-7-7(b) (emphasis added). It is clear from the ordinance that Checker Cab is permitted to create an independent contractor relationship with its drivers. Zurich concedes this point, but challenges Checker Cab's ability to satisfy the statutory test for independent contractor status.

## B. Statutory Test for Independent Contractor Status

A person qualifies as an independent contractor and not an employee "if such person or entity meets all of the following criteria:

(1) Is a party to a contract, written or implied, which intends to create an independent contractor relationship;

(2) Has the right to exercise control over the time, manner, and method of the work to be performed; and

(3) Is paid on a set price per job or a per unit basis, rather than on a salary or hourly basis.

O.C.G.A. § 34-9-2(e). The Court will address each of the mandatory criteria in turn.

### 1. Intention of the Parties

As explained in the Background, Checker Cab's form agreements unambiguously designate its taxi drivers as independent contractors. (See Rozanas Dep., Exs. 9 § I., 10 § I.) The clear intention of the parties is to create an independent contractor relationship. Therefore, Checker Cab has satisfied the first statutory prong.

Zurich argues that section subsection 34-9-2(e)(1) is not met because certain contractual clauses – for example, the non-complete clause, non-solicitation clause, and nuisance clause – are inconsistent with an independent contractor relationship. However, the clauses cited by Zurich do not upset the clear intention of the parties to create an independent contractor relationship. At most, the provisions cited are relevant to the

16

second statutory prong (as Zurich alternatively argues), and the Court will consider them in that context.

## 2. *Right to Exercise Control Over the Time, Manner, and Method of the Work*

Under the second statutory prong, the question is whether the Owner-Drivers and the Lessee-Drivers have "the right to exercise control over the time, manner, and method of the work to be performed," which in this case is the operation of taxicabs and the transportation of passengers. In determining the nature of a business relationship under the Workers' Compensation Act, Georgia courts apply "the same principles that exist under the common law." Fid. & Cas. Co. of New York v. Windham, 209 Ga. 592, 593 (1953).

> The test to be applied in determining whether the relationship of the parties under a contract for the performance of labor is that of employer and servant, or employer and independent contractor, lies in whether the contract gives, or the employer assumes, the right to control the time, manner, and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract.[10]

Golosh v. Cherokee Cab Co., 226 Ga. 636, 637-38 (1970) (quoting Windham, 209 Ga. at 593).

---

[10] In tort cases, Georgia courts apply the exact same test to determine whether employers are vicariously liable for the acts of their alleged employees. See, e.g., Coll. Park Cabs, Inc. v. Justus, 227 Ga. App. 66, 67 (1997); Slater v. Canal Wood Corp. of Augusta, 178 Ga. App. 877, 878 (1986). Thus, the Court, like the parties, will rely on both tort cases and workers' compensation cases in determining the relationship between Checker Cab and its taxi drivers.

"'The right to control the time of doing the job means the right to control the hours of work. The right to control the manner and method means the right to tell the employee how he shall go about doing the job in every detail, including what tools he should use and procedures he shall follow.'" Harris v. City of Chattanooga, Tenn., 507 F. Supp. 365, 368 (N.D. Ga. 1980) (quoting Employers Mut. Liab. Ins. Co. of Wausau v. Johnson, 104 Ga. App. 617, 620 (1961)). In cases involving a contractual relationship, the "test is not whether the employer did in fact control and direct the employee in the work, but it is *whether the employer had that right under the employment contract.*" Golosh, 226 Ga. at 638-39 (emphasis added). This is consistent with subsection 34-9-2(e)(2), which addresses "the right to exercise control" over the work.

Whether the contract creates the relationship of employer-employee or employer-independent contractor is a question of law. Lyons v. Employers Mut. Liab. Ins. Co., 127 Ga. App. 268, 272 (1972); accord Blair v. Smith, 201 Ga. 747, 751 (1947); Lawson Products, Inc. v. Rousey, 132 Ga. App. 726, 728 (1974). However, whether the employer "actually controlled" the time, manner, and method of executing the work is a matter of fact. Lyons, 127 Ga. App. at 274.

### a. Taxicab Cases

In numerous cases, Georgia courts have determined that taxi drivers were independent contractors as a matter of law. See

18

Windham, 209 Ga. 592; Lopez v. El Palmar Taxi, Inc., 297 Ga. App. 121 (2009); Metro Taxi, Inc. v. Brackett, 273 Ga. App. 122 (2005); Smith v. Yellow Cab Co. of Chatham Cnty., Inc., 223 Ga. App. 143 (1996); Hand v. Checker Cab Co., 216 Ga. App. 116 (1995); Loudermilk Enters., Inc. v. Hurtig, 214 Ga. App. 746 (1994) (physical precedent only); Brunson v. Valley Coaches, Inc., 173 Ga. App. 667 (1985); Red Top Cab Co. v. Hyder, 130 Ga. App. 870 (1974); Clark v. Atlanta Veterans Transp., Inc., 113 Ga. App. 531 (1966); Cole v. Peachtree Cab Co., 121 Ga. App. 177 (1970). Of course, the nature of the business relationship depends on the particular facts at hand. Georgia Courts have also found taxi drivers to be employees in some cases. See Golosh, 226 Ga. 636; Am. Ass'n of Cab Cos. v. Parham, 291 Ga. App. 33 (2008); Justus, 227 Ga. App. 66; English v. Yellow Cab Co., 119 Ga. App. 828 (1969); W. End Cab Co. v. Stovall, 98 Ga. App. 724 (1958).

The facts of the present case are remarkably similar to the Georgia cases finding that taxi drivers were independent contractors. For example, in Lopez:

> The evidence does not show that El Palmar assumed control over the time, manner or method of [the driver's] work. He was free to work when and for as long as he wanted, he was not required to accept fares from El Palmar, he could obtain his own fares and he could work anywhere the taxi could legally be operated. The fact that the cars he drove displayed the El Palmar logo and the fact that he received calls from El Palmar are not sufficient to create an employer-employee relationship.

Lopez, 297 Ga. App. at 124.  Similarly, in Cole:

> Claimant is a taxi driver. At the time of his injury he had an arrangement with Peachtree Cab under which he paid a fixed daily rate for the use of its cab and he retained all of the money collected as fares. The company maintained and insured the cab, and claimant bought the gasoline. Most of his calls came through the company's dispatcher by radio. Under nearly identical facts, the Supreme Court has held, as a matter of law, such a claimant is not an employee within the meaning of [the Georgia Workers' Compensation Act].

Cole, 121 Ga. App. at 178 (citing Windham, 209 Ga. 592).

Likewise, in the case of Smith:

> [The driver] signed an agreement stating he was an independent contractor. He could set his own hours, had no duty to report to the dispatcher or to Yellow Cab at any time, and was not required to answer a particular call and had the discretion to decline to transport any intended passenger after answering a call. Moreover, [the driver] was not paid by Yellow Cab; rather, [the driver] paid a set lease fee to Yellow Cab and this fee included the use of Yellow Cab's dispatcher service. He paid for his own gasoline and returned the car to Yellow Cab with a full tank; Yellow Cab did not withhold income tax or file tax forms for [the driver]; he received no vacation or bonus pay from Yellow Cab; and, Yellow Cab did not control the time, manner, method or means by which [the driver] performed his work as a taxicab driver. The lease agreement by which [the driver] leased the vehicle also provided that [the driver] indemnifies and holds harmless Yellow Cab for any and all claims arising out of or caused by his use, operation or maintenance of the vehicle.

Smith, 223 Ga. App. at 143.  On the issue of whether Yellow Cab retained the right to exercise control over the time, manner, and method of the work to be performed, the court held that no

genuine issues of material fact remained and affirmed Yellow Cab's summary judgment motion.[11]  Id.

In Loudermilk, the evidence showed that:

> [E]very . . . driver signed a written agreement with Loudermilk providing that the driver's relationship with Loudermilk was that of an independent contractor. Some drivers owned their own taxicabs and others leased a taxicab owned and maintained by Loudermilk. In either case, the driver paid a fixed fee to Loudermilk, which provided communications services by taking telephone calls from taxicab customers and relaying the calls by radio to the taxicab drivers. The taxicab drivers retained the fares they collected from customers and did not share their profits or losses with Loudermilk. The president of Loudermilk testified that the time, manner and method of operating the taxicabs was vested with the individual drivers, who were not required to work and were not restricted to any particular time or location.

Loudermilk, 214 Ga. App. at 747.  Also, the drivers' vehicles and the receipts provided to passengers bore the company's name. Id. at 748.  Under these facts, the court held that the evidence was insufficient to sustain a verdict finding an agency relationship.[12]  Id.

In Hyder, the company owned the taxicab and leased it to its drivers on a daily basis for a specific fee.  Hyder, 130 Ga. App. at 870.  Although the company "relayed telephone messages

___

[11] Smith was later overruled because the Smith court did not properly follow the local ordinance rule. See Karwoski, 226 Ga. App. at 69.  However, the Karwoski court did nothing to impugn the Smith court's reasoning on the issue of control.  Indeed, the Georgia Court of Appeals has since relied on Smith in addressing the control issue.  See Brackett, 273 Ga. App. at 123-24 (citing Smith).

[12] The Court recognizes that Loudermilk was a single-judge opinion and physical precedent only.  The Court references this opinion solely for its persuasive value.

to the drivers of the taxies when someone called for a taxi, it had no control as to whether the driver of the taxi picked up the person who called in." Id. Further, the company "did not participate in the profits or losses of the taxi drivers." The court found no evidence of control or agency and reversed denial of the taxi company's motion for summary judgment. Id.

Likewise, in Brunson, the taxi company was entitled to summary judgment on a tort claim due to lack of control over its taxi driver where (1) the company leased the cab to the driver, (2) the company provided dispatch services, (3) the lease contract vested discretion in operation of the cab to the driver, (4) actual practice was consistent with the terms of the contract, (5) the company did not share in profits and losses of the driver, (6) the driver paid a flat fee and a mileage fee to the company under the lease, and (7) the company assumed no responsibility for obtaining the driver's taxi license or for resolving customer complaints. Brunson, 173 Ga. App. at 668.

### b. Application of General Principles

A few general principles can be gleaned from the caselaw. First, to be considered independent contractors, the taxi drivers must be able set their own schedules. See Windham, 209 Ga. at 594; Lopez, 297 Ga. App. at 121; Smith, 223 Ga. App. at 143; Loudermilk, 214 Ga. App. at 747. In contrast, in Golosh, there was evidence that "the employer could tell the [taxi driver] when to come to work, how long to work and when to quit

22

work, and that if he refused to obey the employer's instructions as to working hours, the employer could discharge him." Golosh, 226 Ga. at 638. That evidence was sufficient to show that the employer had control over the driver and to establish an employer-employee relationship. Id. at 638-39. In this case, the Owner-Drivers and Lessee-Drivers had control over their own schedules without any interference from Checker Cab.[13]

Second, taxi drivers classified as independent contractors are generally free to work in locations of their choice, subject only to compliance with licensing and permit requirements imposed by local governments. Lopez, 297 Ga. App. at 124; Hand, 216 Ga. App at 116; Loudermilk, 214 Ga. App. at 747. Here, Checker Cab did not restrict where the Owner-Drivers and Lessee-Drivers could work. The drivers could choose to work around downtown Augusta or could pay the access fees imposed by third parties at Fort Gordon, the Augusta Regional Airport, and the Augusta Mall. (Rozanas Dep. at 29-30, 60-64.) The contracts do not limit where the drivers could work, subject only to compliance with local law. (See id., Exs. 9, 10.)

---

[13] During the application process and prior to signing contracts with Checker Cab, the Lessee-Drivers could check that they desired a "day" shift, "night" shift, or "first available" shift. Checker Cab would inform the potential Lessee-Driver of what was currently available. (Rozanas Dep. at 90.) Zurich contends that this amounts to control over when and how often the Lessee-Drivers work. The Court disagrees. Even viewing the evidence in the light most favorable to Zurich, it is undisputed that once the contracts were signed, Lessee-Drivers were free to control their schedules amongst themselves without any interference by Checker Cab. (Id. at 87-88.)

Third, the financial relationship between taxi companies and taxi drivers classified as independent contractors is typically structured as follows: The drivers pay a flat fee for dispatch services and/or to lease the vehicle; the drivers keep the fares for themselves; and the taxi company does not pay any wages or bonuses. See Windham, 209 Ga. at 594; Lopez, 297 Ga. App. at 122 n.3; Brackett, 273 Ga. App. at 123; Smith, 223 Ga. App. at 143; Loudermilk, 214 Ga. App. at 747; Brunson, 173 Ga. App. at 668; Hyder, 130 Ga. App. at 870. Here, Checker Cab and its drivers utilize this same arrangement.

Fourth, "[t]he fact that the [taxicab company] relayed messages when someone called in for a taxi would not alone be sufficient to establish that [the driver] was the [taxicab company's] agent." Brackett, 273 Ga. App. at 123. However, an inquiry which has proven to be dispositive of the control issue in several cases is whether the taxi drivers are required to respond to the company's dispatch service. Compare Justus, 227 Ga. App. at 68 (finding sufficient evidence of control to uphold verdict where taxi driver "was required to accept calls while she was on duty"); Parham, 291 Ga. App. at 164-65 (finding sufficient evidence of agency to uphold verdict where taxi driver had agreement with company to always respond to the dispatch calls), with Brackett, 273 Ga. App. at 123 (overturning jury verdict where "there was no evidence that the drivers were required by Metro Taxi to accept calls" and taxi driver was a an

24

independent contractor as a matter of law); <u>Smith</u>, 223 Ga. App. at 143 (affirming summary judgment for taxi company where driver was not required to report to the dispatcher, "was not required to answer a particular call, and had the discretion to decline to transport any intended passenger after answering a call"); <u>Hand</u>, 216, Ga. App. at 116 (affirming summary judgment for taxi company where driver "could receive calls from Checker Cab if he wished, but he was not required to do so"); <u>Hyder</u>, 130 Ga. App. at 870 (similar). Here, the Owner-Drivers and Lessee-Drivers are not required to answer any call from Checker Cab's dispatcher and are free to decline to transport any passenger even after answering a dispatch call.

Fifth, a taxi company that owns the vehicle and pays for some vehicle expenses may still have an independent contractor relationship with its drivers. <u>See</u> <u>Windham</u>, 209 Ga. at 594 (company owned and leased cabs and supplied the oil); <u>Cole</u>, 121 Ga. App. at 177 (company owned and leased cabs, provided maintenance services, and insured the vehicles). Thus, the Lessee-Drivers may still be classified as independent contractors even though they leased the cabs, and Checker Cab paid for the insurance and maintenance. For the same reason, it is of little consequence that Checker Cab pays for wireless internet access in the taxis and paid for cell phone service prior to wireless access. (Rozanas Dep. at 64-65, 137-39.)

25

Finally, the fact that Checker Cab's drivers wear a collared shirt with a Checker Cab logo on it is not inconsistent with independent contractor status. Cf. Lopez, 297 Ga. App. at 121 (drivers deemed independent contractors even though all drivers had to have white cab with company logo); Loudermilk, 214 Ga. App. at 748 (drivers deemed independent contractors even though cabs and receipts bore company name).

In summary, the relationship between Checker Cab and the Owner-Drivers and Lessee-Drivers is generally consistent with an independent contractor relationship. The Court, however, will address specific contract clauses that Zurich argues take away the drivers' control over the operation of their taxicabs.

### c. Nuisance Clause

As discussed in the background, Checker Cab's contracts include a Nuisance Clause which prohibits certain behaviors. Relying on Hand and Lopez, Zurich contends that this clause constitutes control by Checker Cab and creates an employer-employee relationship. In Hand, the court affirmed summary judgment for the taxi company where the driver was "licensed by the local jurisdictions in which he drove and was subject to the rules and regulations of those jurisdictions" and the taxi company "imposed *no rules* on [the driver's] operation of the vehicle." Hand, 216 Ga. App. at 116 (emphasis added). In Lopez, the taxi company gave its drivers "certain rules to follow — dress neatly, do not allow smoking in the car, do not

allow passengers in front unless absolutely necessary, and ask the passengers to wear their seat belts." _Lopez_, 297 Ga. App. at 121. The company's representative testified that these rules were imposed by the city. _Id._ Ultimately, the court decided that the driver was an independent contractor as a matter of law. _Id._ Presumably, these Georgia courts reasoned that any rules already imposed by the law do not constitute control by the taxi company, even if the company issued the same rules to ensure compliance with the law.

Similar to the _Lopez_ case, Checker Cab's representative testified that it imposed the Nuisance Clause to ensure that its taxi drivers comply with Augusta-Richmond County ordinance governing the operation of taxi cabs.[14] (See Rozanas Aff. ¶ 6; _see also_ Rozanas Dep. at 71–72, 76, 83.) However, Zurich argues the Nuisance Clause here, unlike _Lopez_, is broader than the ordinance.

Most of the rules within the Nuisance Clause are coextensive with the county code. For example, the rules against smoking, spitting, and other "unsanitary" behaviors fall within the local ordinance. _See_ Augusta-Richmond Cnty. Code § 6-7-14 (requiring every taxi to be "kept, at all times, in a clean and sanitary condition according to the rules and

---

[14] Also, pursuant to another clause in the contracts, the drivers agreed "to comply and abide by all laws, ordinances, rules, and regulations of federal, state, county, municipal, and any other governmental authorities." (Rozanas Dep., Exs. 9 § X.c., 10 § X.c.)

regulations promulgated and issued by the sheriff's department"); see also id. § 6-7-21 (requiring drivers to "maintain a clean, neat personal appearance"). The Nuisance Clause prohibits drivers from stopping for personal business. This falls within section 6-7-22, which prohibits taxi drivers from using their vehicles "for any purpose other than the transporting of passengers and their baggage." Other behavior prohibited by the Nuisance Clause is not mentioned in the ordinance but is illegal under other legal authorities – for example, gambling and physical violence. The Nuisance Clause's general restriction on "loud, indecent, or profane language" is also prohibited by the ordinance to some extent. See id. § 6-7-30(b) ("No driver shall solicit patronage in a loud or annoying tone of voice . . . ." (emphasis added)).

Yet, some of the rules in the Nuisance Clause are not necessarily proscribed by the ordinance or other laws. For example, the Nuisance Clause prohibits "insensitive practices," "verbal confrontation[s]" with customers to settle a disagreement, and carrying firearms. Moreover, the Nuisance Clause proscribes "any behavior that can be deemed harmful to the company." The drivers further agreed "to abide by the policies of Checker Cab of Augusta." Presumably, this would include the "Checker Cab of Augusta Taxi Driver Code of Ethics,"

which includes a number of rules which are clearly outside of the local ordinance and other applicable law.[15]

Assuming that the prohibition of otherwise legal behaviors by the Nuisance Clause and Code of Ethics constitutes "control" over the drivers, there arises an irreconcilable conflict among the provisions in the contracts. The contracts stipulate that the Owner-Drivers and Lessee-Drivers will be "free from interference or control on the part of Checker Cab in operation of the Cab, subject only to adherence to applicable statutes and ordinances." (Rozanas Dep., Exs. 9 § I.a., 10 § I.a.) Checker Cab further agreed that the taxi drivers are "free from authority and control" of Checker Cab. (Id., Exs. 9 § I.b., 10 § I.b.) The contracts vested discretion in the operation of the cabs to the individual drivers and agreed that Checker Cab "shall do no more than make available" the dispatch service of prospective passengers. (Id., Exs. 9 § IX.c., 10 § VI.c.) These provisions are inconsistent with any right to control granted to Checker Cab through the Nuisance Clause.

Where there are contradictory provisions in a contract, the court should first attempt a construction which will uphold the contract as a whole. Joseph Camacho Assocs., v. Millard, 169 Ga. App. 937, 938 (1984). "The ambiguity created by the inconsistent provisions may be resolved by looking to the

---

[15] For example, under the Code of Ethics, the taxi drivers pledged to take the shortest or most practical route, to offer to turn on the air-conditioning or heat, and to accept all forms of payment.

contract as a whole to ascertain the intention of the parties."
Id. at 937-38. In such a case, the intention of the parties
controls and should be given effect "regardless of mere literal
repugnancies in different clauses of the [agreement]." Golden
Peanut Co. v. Bass, 275 Ga. 145, 149 (2002).

> Viewing the contract as a whole, where there are
> conflicting provisions, the clause contributing most
> essentially to the contract is entitled to the greater
> consideration.... A subsidiary provision should be so
> interpreted as not to be in conflict with what clearly
> appears to be the "dominant purpose" of the contract.

Id. (quotations and citations omitted). Additionally, in the
event of an "irreconcilable conflict in the provisions of a
contract, the provision first set forth in the contract
prevails." Barge & Co. v. City of Atlanta, 161 Ga. App. 675,
678 (1982); see also Joseph Camacho Assocs., 169 Ga. App. at 938
("[T]he law in Georgia remains that the first of two
contradictory contract clauses will prevail.").

The Court makes two observations. First, the "dominant
purpose" of the contracts at issue is to create an independent
contractor relationship in which the Owner-Drivers and Lessee-
Drivers have discretion to operate their taxis without
interference or control by Checker Cab, subject only to
compliance with the law. The Nuisance Clause is subsidiary to
this dominant purpose. Further, Checker Cab's representative
testified that the Nuisance Clause was inserted with the
intention of maintaining compliance with the local ordinance,

not to take control away from its drivers. Second, Sections I.a and I.b of the contracts, which provide that the drivers are free from interference and control of Checker Cab, are set forth before the Nuisance Clause. Under Georgia law, the first of two contradictory clauses will prevail. Thus, under Georgia principles of contract interpretation, the Nuisance Clause was unenforceable (to the extent it reaches beyond the local ordinance and other law) and did not give Checker Cab any right to control the taxi drivers.

### d. Right to Terminate

One provision of the Nuisance Clause merits further consideration. Checker Cab was given the power to end the contractual relationship if the driver accumulated five passenger complaints over a twelve-month period. Even assuming Checker Cab reserved the right to terminate the contract due to passenger complaints, "the reservation of that right is not dispositive. Georgia courts have repeatedly held that the employer's right to terminate the contract, or to fire his employee's employees, is not necessarily inconsistent with the independent contractor relationship." Harris, 507 F. Supp. at 372; see, e.g., State v. Goolsby, 191 Ga. App. 161, 163.

In the specific context of taxicab services, the Georgia Supreme Court has held that a taxi company's ability to stop renewing a lease agreement with a driver "would not amount to a control of the time, manner, and method of the operation of the

31

cab by the company." Windham, 209 Ga. at 595; see also Cole, 121 Ga. App. at 178 ("Windham specifically states that the refusal to continue the rental arrangement 'would not amount to a control of the time, manner, and method of the operation of the cab by the company.'").

Zurich places great weight on the following quote from Golosh: "[T]his evidence as to the power to terminate the employment alone is sufficient evidence to authorize a finding that the cab company had the right to control the time, manner and method of doing the work." Golosh, 226 Ga. at 638. However, it is a mistake to view the quote in isolation. The complete passage shows:

> [The taxi driver] testified that the employer could tell him when to come to work, how long to work and when to quit work, and that if he refused to obey the employer's instructions as to working hours, the employer could discharge him or refuse to let him drive a cab thereafter. We have no hesitancy in holding that, nothing else appearing, *this evidence* as to the power to terminate the employment alone is sufficient evidence to authorize a finding that the cab company had the right to control the time, manner and method of doing the work.

Id. (emphasis added). Viewed in context, "this evidence" as to the power to terminate referred to the ability to terminate for failure to obey the employer's mandatory schedule – which is clear control over the "time" of the employee. Such control does not exist in this case.

Loudermilk provides a much stronger comparison. In that case:

32

There was no evidence that Loudermilk assumed control over any driver's operation of a taxicab. Evidence that Loudermilk criticized some drivers based on complaints received from customers and terminated some drivers for this reason is not the equivalent of assuming control over the means and method of the work. "It is well recognized that merely taking steps to see that the contractor carries out his agreement, by supervision of the intermediate results obtained, or reserving the right of dismissal on grounds of incompetence, is not such interference and assumption of control as will render the employer liable."

Loudermilk, 214 Ga. App. at 748-49 (physical precedent only) (quoting Slater v. Canal Wood Corp. of Augusta, 178 Ga. App. 877, 881 (1986)). The facts of the present case are practically indistinguishable, and the Court finds Loudermilk's reasoning persuasive, if not compelling.

In summary, to the extent that Checker Cab reserved the right to terminate or refuse to renew its contracts based on passenger complaints, this does not constitute the right to control the time, manner, and method of the work of the Owner-Drivers and Lessee-Drivers.

### e. Restrictive Covenants

As discussed in the background, Checker Cab's contracts contained a non-compete clause and a non-solicitation clause. These clauses are unenforceable and therefore did not legally grant Checker Cab any right to control the Owner-Drivers and Lessee-Drivers.

Before 2011, Georgia law disfavored restrictive covenants. See Becham v. Synthes USA, 482 Fed. Appx. 387, 388 (11th Cir.

2012). The "new" Georgia law, which is more favorable to the enforcement of restrictive covenants, applies to agreements entered into after May 11, 2011. See id. at 388-89, 391-92 (thoroughly explaining legislative history and effective date of HB 30).

Of the ninety-five taxicab drivers that have operated taxicabs under contract with Checker Cab since 2008, eighty-five of them executed their contracts before May 11, 2011. (Rozanas "March 21, 2013" Aff. ¶ 3.) As to those eighty-five contracts governed by the "old" Georgia law, the restrictive covenants are unenforceable for the following reasons. First, a non-compete agreement that contains "a territorial limitation which cannot be determined until the date of the employee's termination is unreasonable as a matter of law." BellSouth Corp. v. Forsee, 265 Ga. App. 589, 596 (2004); see also Becham, 482 Fed. Appx. at 393 (Under the "old" Georgia law, "the noncompete covenant fails because it contains a territorial limitation not determinable until the time of the employee's termination." (internal quotations omitted)). Here, the non-compete restriction purports to apply to: (i) all counties in Georgia and South Carolina, (ii) all other states in the United States, and (iii) all other countries of the world; provided that, with respect to clauses (ii) and (iii), that Checker Cab derives 5% of its gross revenues from such geographic area "prior to the date of expiration or termination of the Agreement." It is impossible

34

to determine the geographic scope of this covenant until the date of expiration or termination of the contract. Therefore, it is "unenforceable on its face." BellSouth Corp., 265 Ga. App. at 596. Second, as to the non-solicitation clause, it contained no territorial limitation whatsoever. (See Rozanas Dep., Ex. 9 § XV., 10 § XVI.) It is therefore unreasonable and unenforceable. See Becham, 482 Fed. Appx. at 393 ("[T]the nonsolicitation-of-employees covenant fails because it lacks any territorial limitation.").

Under the "new" Georgia law, the restrictive covenants might still be overbroad or indefinite, but even if so, "the court may modify the restraint provision" to provide reasonable protection to the legitimate business interests of the person seeking enforcement and "to achieve the original intent of the contracting parties to the extent possible." O.C.G.A. § 13-8-54. However, even assuming that the restrictive covenants in the ten remaining contracts could be modified under section 13-8-54, the covenants are unenforceable for the same reasons that Nuisance Clause provisions are unenforceable. To the extent that the non-compete clause and non-solicitation clause amount to "control" over the drivers, they would be in direct conflict with Sections I.a. and I.b., which provide that the taxi drivers are free from interference or control of Checker Cab.

As previously explained, the Court first looks to the intent of the parties and the dominant purpose of the contract

to resolve the conflict.  And in the event of an irreconcilable conflict, the first of the two clauses will prevail.

The non-compete clause was inserted in 2009 to discourage drivers from picking up passengers inside Fort Gordon and dropping them off outside the access gate to be picked up by drivers of other companies.  (Rozanas Dep. at 142-43.)  Checker Cab's representative testified that this practice was unacceptable under the contract awarded by Fort Gordon.  (Id. at 34, 143.)  The intention of the restrictive covenants was to ensure compliance with rules imposed by Fort Gordon authorities, not to independently exert control over the parties.  In light of these facts, the Court's view of the dominant purpose of the contracts remains unchanged.  The dominant purpose was to create an independent business relationship in which Checker Cab provided a dispatch service and the Owner-Drivers and Lessee-Drivers had discretion to operate their taxis whenever, wherever, and however they saw fit, subject only to compliance with the law and rules imposed by third-parties.  Furthermore, Section I precedes and therefore prevails over the restrictive covenants.

### f.  Other Control Arguments

Zurich argues that the following facts are indicative of an employer-employee relationship.  (Doc. no. 25, Ex. 2 at 7-10.)

### i. *Application Process*

The applications for Owner-Drivers and Lessee-Drivers state that "falsified statements on this application are grounds for contract termination." (Rozanas Dep., Exs. 20-21.) This is not indicative of an employer-employee relationship. Control over the application process does not amount to control over the time, manner, and method of the work to be performed.

### ii. *GPS and Video Monitoring*

Some of the leased taxicabs contained video cameras. (Rozanas Dep. at 83-84.) If the cab was stolen or there was some other kind of incident, Checker Cab would have access to the video data.[16] (Id.) All of the cabs (leased and owned) were equipped with computer tablets that included GPS tracking software. (Id. at 85-86.) This surveillance is not at odds with an independent contractor relationship. Monitoring is not control. See Goolsby, 191 Ga. App. at 163 ("[T]he *continuous check* of the work of an independent contractor to see that the work is being done according to the specifications of the job is thoroughly consistent with the relationship of employer and independent contractor and with the mere right of the employer to insist on a certain specific result." (emphasis added)).

---

[16] Checker Cab never actually accessed the data. (Id. at 84.)

### iii. Inspection of Leased Vehicles

Lessee-Drivers filled out and submitted inspection sheets when they changed shifts. (Rozanas Dep. at 87-89.) Checker Cab itself did weekly inspections as of 2010 but inspects less frequently now. (Id.) However, the "continuous check" of the cabs is consistent with an independent contractor relationship. See Goolsby, 191 Ga. App. at 163. Moreover, the local ordinance required that every taxi be "clean and sanitary." Augusta-Richmond Cnty. Code § 6-7-14. Checker Cab could require its drivers to maintain compliance with the local ordinance without creating employer-employee relationships.

### iv. Drug and Alcohol Test Consent Forms

Some of the taxi drivers signed a consent form authorizing Checker Cab to test them for alcohol and illegal drugs.[17] (See Rozanas Dep. at 77-79, & Exs. 15-17.) This authority is substantially within the purview of ensuring compliance with the law.

### g. Conclusion

The Owner-Drivers and the Lessee-Drivers have "the right to exercise control over the time, manner, and method of the work to be performed." O.C.G.A. § 34-9-2(e). The drivers had control over their schedules, were free to work in locations of their choice, and were not required to take calls from Checker

---

[17] Checker Cab never actually tested any of the drivers. (Rozanas Dep. at 103-04.)

Cab's dispatch service. The Nuisance Clause and restrictive covenants were unenforceable under Georgia law and therefore conferred no right of control to Checker Cab. Moreover, there is no evidence on the record that Checker Cab, in practice, actually assumed control over the drivers by attempting to enforce these clauses or through other means. The bottom line is that the drivers could operate their taxicabs and transport their passengers using the means and methods they chose and on their own schedules. Checker Cab did not have the right to control the drivers in any way that would vitiate their independent contractor relationship.

### 3. Method of Payment

Under the third prong of the statute, an independent contractor must be "paid on a set price per job or a per unit basis, rather than on a salary or hourly basis." O.C.G.A. § 34-9-2(e)(3). It is undisputed that the Owner-Drivers and Lessee-Drivers earn income from passenger fares, and Checker Cab pays no salaries or hourly wages. Indeed, Zurich concedes that Checker Cab meets this provision of the statute.

In summary, the Owner-Drivers and Lessee-Drivers meet all three criteria set forth in O.C.G.A. § 34-9-2 and are legally classified as independent contractors. Therefore, Checker Cab does not owe Zurich the unpaid premium balances claimed under the First, Second, Third, and Fourth Insurance Policies.

### III. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment (doc. no. 20) is **GRANTED** and Plaintiff's Motion for Summary Judgment (doc. no. 25) is **DENIED**. The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in favor of Defendant. The Clerk shall terminate all deadlines and motions, and **CLOSE** the case.

**ORDER ENTERED** at Augusta, Georgia, this 30th day of September, 2013.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA